UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ANDREW R. MULLINGS,

                                    Plaintiff,

              -against-

(1) Edward Burnett, Superintendent, Fishkill Correctional
Facility; (2) Michael Daye, First Dep. Superintendent,
Fishkill Correctional Facility; (3) C. Churns, Captain, Fishkill
Correctional Facility; (4) Joseph Noeth, Dep. Comm. Facility
Operations, N.Y.D.O.C.S. & C.S.;[1] (5) Darren Miller, Chief
Investigator N.Y.D.O.C.S. & C.S. OSI;[2] (6) Chad LeClair,
Correction Officer, Wallkill Correctional Facility; (7) S.
Thompson, Correction Officer, Fishkill Correctional Facility;
(8) M. Pierre', RN, Fishkill Correctional Facility, Medical
Unit; (9) Gaetan Zamilus, MD, Fishkill Medical Unit
Correctional Facility, (10) J. Willson, Correction Officer,
Fishkill Correctional Facility; (11) Steve Farrell, Correction
Officer, Fishkill Correctional Facility; 12-48: John Doe
C.E.R.T.[3] Officer(s), #'s 1-38, that searched Housing Unit 10-2,
                            **Defendants,**
**In Their Individual Capacity,**

**SECOND          AMENDED
COMPLAINT JURY TRIAL
DEMANDED**
Case 7:22-cv-0722-CS

## I. COMPLAINT

Plaintiff, Andrew R. Mullings, acting *pro se* for his complaint states as follows:

## II. JURISDICTION AND VENUE

This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the

deprivation, under color of law, of rights guaranteed by the First, Fifth, Eight, and Fourteen

Amendments to the United States Constitution. This Court has jurisdiction over this action under

28 U.S.C. §§ 1331, 1343 (a) (1), (2), (3), and (4).

Venue properly lies in this District pursuant to 18 U.S.C. § 139 (b) (1) and (2) because

the events given rise to this cause of action occurred at Fishkill Correctional Facility, PO Box

1245, Beacon, NY 12508, which is located within the Southern District of the State of NY.

---

[1] N.Y.S.D.O.C.S. & C.S. refers to New York State Dep't of Corr. & Community Supervision
[2] OSI refers to Office of Special Investigation
[3] C.E.R.T. refers to Correctional Emergency Response Team

## III. PLAINTIFF INFORMATION

Andrew                R.          Mullings
First Name      Middle      Last Name

Detention Person A#:      075 809 426
Detainee                          A-Number

Buffalo   Federal   Detention   Facility
Current Place of Detention

4250            Federal              Drive
Institutional Address

Batavia,        New York        14020
County, City      State        Zip Code

## IV. DETAINEE STATUS

Immigration Detainee

## V. DEFENDANT(S) INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct

information is not provided, it could delay or prevent service of the complaint. Make sure that the

defendants listed below are identical to those listed in the caption. Attach additional pages as

necessary.

**Defendant 1:** Edward                              Burnett                      N/A
                    First Name                    Last Name                Shield#

Superintendent,      Fishkill      Correctional          Facility
Current job Title (or other identifying information)

18                            Strack                        Drive
Current Work Address

Beacon                    New York                    12508
County, City                State                    Zip Code

**Defendant 2:** Michael                          Daye                        N/A
                    First Name                    Last Name                Shield#

First   Dep.   Superintendent,   Fishkill   Correctional   Facility
Current Job Title (or other identifying information)

18 _____ Strack _____ Drive
Current Work Address

Beacon _____ New York _____ 12508
County, City _____ State _____ Zip Code

**Defendant 3:** C. _____ Churns _____ N/A
First Name _____ Last Name _____ Shield#

Captain, _____ Fishkill _____ Correctional _____ Facility
Current Job Title (or other identifying information)

18 _____ Strack _____ Drive
Current Work Address

Beacon _____ New York _____ 12508
County, City _____ State _____ Zip Code

**Defendant 4:** Joseph _____ Noeth _____ N/A
First Name _____ Last Name _____ Zip Code

Dep. Comm. Facility _____ Operations, _____ N.Y.D.O.C.S. & C.S.
Current Job Title (or other identifying information)

1220 _____ Washington, _____ Ave, _____ Building #2
Current Work Address

Albany _____ New York _____ 12226
County, City _____ State _____ Zip Code

**Defendant 5:** Darren _____ Miller _____ N/A
First _____ Last Name _____ Shield #

Chief _____ Investigator _____ N.Y.D.O.C.S. & C.S. OSI
Current Job Title (or other identifying information)

1220 _____ Washington, _____ Ave. _____ Building #2
Current Work Address

Albany _____ New York _____ 12226
County, City _____ State _____ Zip Code

**Defendant 6:** Chad _____ LeClair _____ N/A
First Name _____ Last Name _____ Shield#

Correction Officer, _____ Wallkill _____ Correctional _____ Facility
Current Job Title (or other identifying information)

50    McKendrick              Road,              P.O. Box G
Current Work Address

Wallkill,                 New York            12589-0286
County, City              State               Zip Code

**Defendant 7:** S.                    Thompson              N/A
First Name                Last Name            Shield #

Correction    Officer,    Fishkill    Correctional    Facility
Current Job Title (or other identifying information)

18                        Strack               Drive
Current Work Address

Beacon                    New York             12508
County, City              State                Zip Code

**Defendant 8:** M.                    Pierre'              N/A
First Name                Last Name            Shield #

R.N.,             Fishkill        Correctional    Facility
Current Job Title (or other identifying information)

18                        Strack               Drive
Current Work Address

Beacon         New York                         12508
County, City              State                Zip Code

**Defendant 9:** Gaetan                Zamilus               N/A
First                     Last Name            Shield #

M.D.,             Fishkill        Correctional    Facility
Current Job Title (or other identifying information)

18                        Strack               Drive
Current Work Address
Beacon                    New York             12508
County, City              State                Zip Code

**Defendant 10:** J.                    Willson               N/A
First                     Last Name            Shield #

Correction    Officer,    Fishkill    Correctional    Facility
Current Job Title (or other identifying information)

| 18 | Strack | Drive |
| --- | --- | --- |
| Current Work Address | | |

| Beacon | New York | 12508 |
| --- | --- | --- |
| County, City | State | Zip Code |

**Defendant 11:** Steve

| Steve | Farrell | N/A |
| --- | --- | --- |
| First | Last Name | Shield # |

| Correction    Officer,    Fishkill    Correctional    Facility |
| --- |
| Current Job Title (or other identifying information) |

| 18 | Strack | Drive |
| --- | --- | --- |
| Current Work Address | | |

| Beacon | New York | 12508 |
| --- | --- | --- |
| County, City | State | Zip Code |

**Defendant(s) 12 thru 48:**

| John | Doe | C.E.R.T. | Officer(s), #'s | N/A |
| --- | --- | --- | --- | --- |
| First Name | | Last Name | | Shield # |

| Corrections    Officers    that    searched Housing    Unit 10-2 |
| --- |
| Current Job Title (or other identifying information) |

| Employer    Address:    1220    Washington    Avenue |
| --- |
| Current Work Address |

| Albany | New York | 12226 |
| --- | --- | --- |
| County, City | State | Zip Code |

## VI. STATEMENT OF CLAIM

Place(s) of occurrence:        Fishkill Correctional Facility

Date(s) of occurrence: December 29, 2021 - January 2022

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how much each defendant was personally involved in the alleged wrongful actions.

1.        On December 24, 2021, an Incarcerated Individual ("I/I") at Fishkill Correctional Facility

("Fishkill") attempted to escape. Because of this incident, and among prior incidents, on or about

December 25, 2021, the defendant(s) utilized the Correction Emergency Response Team

("CERT") squads; Office of Special Investigation ("OSI"); K-9 unit, and another unit wearing

military uniforms were deployed to conduct a retaliatory show of force masqueraded as a facility

search to extract revenge for actions having nothing to do with Andrew Mullings ("Plaintiff").

### Plaintiff's First Sickness:

2.      On or around December 21, 2021, Plaintiff developed a fever. On December 27, 2021 he

recovered but was still under the weather.

### CERT Officers Arrive at Housing Unit 10-2:

3.      The tragedy began for Plaintiff on December 29, 2021, at approximately 1:50pm when

Plaintiff was laying down in his heated room, in his bed, when the defendants entered his

housing unit (10-2), at Fishkill, and a CERT Officer 17-28, Chad LeClair[4] ("LeClair") pushed

Plaintiff's room door wide open and said to him; "!!Get the fuck out now!!"

4.      As soon as Plaintiff got up out of his bed, LeClair started to prevent Plaintiff from

looking at his face by immediately ordered Plaintiff to turn around, step out of his room back

way, and then he aggressively had the Plaintiff placed his hands on the wall; then without pat-

frisking Plaintiff's person, LeClair immediately had Plaintiff remove his hands from the wall and

had Plaintiff strip down to his underwear (boxers), and further had Plaintiff throw all his clothes

(sweatshirt, T-shirt, sweat pants, socks, face mask, and religious headgear) on the dirty ground.

---

[4] In responded to Judge Cathy Seibel's *Valentin* Order dated 10/14/2022 (*see* Doc. 10), the Assistant
Attorney General ("AAG") identified CERT Officer 17-28 as Correction Officer Chad LeClair; and
asked Judge Seibel to (1) Modify her *Valentin* Order to *only* those defendants who have specific
involvement alleged by Plaintiff in his Complaint, and (2) that Plaintiff be directed to provide further
identifying information about those specific CERT Officers. (*see,* Doc. 36). The AAG also stated, ...
"('DOCCS') advises that, based upon the information in the Complaint, specific CERT Officers with
whom Plaintiff interacted cannot be identified." (*see* Doc. id, at foot note 2). By Order dated 1/3/2023,
Judge Seibel agree that the AAG should be required to identify only those officers who are alleged to
have done something specific to violate Plaintiff's rights or to have failed to intervene in a violation by
someone else. In addition, this Court held that, Plaintiff shall submit a letter providing further identifying
information about the specific officers to whom he refers to in his Complaint... (*see.* Doc. 43).

5.    LeClair then started to apply unnecessary excessive force upon the Plaintiff by having the Plaintiff inter-lock his fingers over his head and then LeClair placed his hand on Plaintiff's interlocked fingers and began squeezing on them tightly, causing pain, and then instructed the Plaintiff to, step back, turn his head and walk forward.

6.    As Plaintiff was about to start walking, LeClair told Plaintiff to wait. This was because Fishkill Superintendent Edward Burnett ("Supt. Burnett") was walking by and stopped right in front of the Plaintiff; who then started to observe the Plaintiff's and the other I/Is semi-nude bodies with our fingers inter-locked over our heads. Supt. Burnett failed to intervene and stop the deliberate punishment that we were being subject to.

7.    When Supt. Burnett finished observing us, he started walking towards the back of the housing unit to the 8-2 recreation room. At which point LeClair gave Plaintiff direct orders to walk behind Supt. Burnett and to look at the ground to prevent Plaintiff from seeing the defendants' faces. Plaintiff was now walking behind Supt. Burnett with his fingers still inter-locked over his head while LeClair again continued to apply unnecessary and excessive pressure by squeezing, causing Plaintiff pain, when there were no penological reasons for doing so.

**CERT Officers Expose Plaintiff to Freezing Weather after Disrobing Him:**

8.    When Supt. Burnett turns left into the recreation room, LeClair ordered Plaintiff to also trun left behind Supt. Burnett. Upon Plaintiff entering the recreation room, he rolled his eyes and seen Superintendent Burnett, First Deputy Superintendent Daye, Deputy Commissioner of Facility Operations Joseph Noeth, Chief OSI Investigator Darren Miller, Captain C. Churns, and other Correctional Executives from Fishkill and Albany wearing suite jackets were standing in the recreation room condoning and observing Fishkill Correction Officer S. Thompson ("Thompson") and the other John Doe CERT Officers, intentionally, maliciously, and sadistically

opened all the windows[5] in the recreation room to let in the very cold weather on the Plaintiff's

and the other I/Is' semi-nude bodies, and to punish us for prior actions of another I/I attempted to

escape that had nothing to do with us.

9.      Upon information and belief, Supt. Burnett and the other Correctional Executives from

Fishkill and Albany condoned the opening of the windows because they failed to intervene by

telling the CERT Officers to close the windows; to keep out the freezing cold air. (*See*, Exhibit 1

[World Weather Report 12/29/2021]).

10.     Upon further information and belief, Fishkill Correctional Officer Steve Farrell

("Farrell") also condoned to the opening of the windows because he too had stripped down I/I

Sampson to his boxers *only* and escorted him into the recreation room to stand still in the cold

weather and then return to Sampson's cube and searched it. Sampson was assaulted by a Doe #4.[6]

---

[5] These unknown CERT Officers that helped Thompson opened the windows were white guys and some of them had a handkerchief or something like a cloth around their faces and necks (*see*, Doc. 45, at f.n. 1)
[6] By letter dated 1/23/2023, Plaintiff responded to the Court ordered (*see*, Doc. 43) by providing additional information to the AAG to use to identify Doe # 1 and other unidentified defendants. That is, Plaintiff stated that an I/I named Sampson was assault inside of 10-2 recreation room on 12/29/2021 by a CERT Officer John Doe #4, and that when Plaintiff had asked Doe #1 to closed the windows because he was cold, Doe #1 told Plaintiff to shout his "fucken" mouth, and then Plaintiff heard when Doe #4 asked Doe #1 "what's going on?" And Doe #1 told Doe #4 that Plaintiff had asked for the windows to be closed because of the cold weather. (*see*, Doc. 45, Page 4 of 6, first para.). Plaintiff also stated that, upon information and belief, Doe #4 is the same person that assault I/I Sampson. Plaintiff then asked the Court and the AAG to assist him in finding Doe #4, by requesting DOCCS's log book for all of the CERT Officers that were posted inside of 10-2 recreation room on 12/29/21, which would reveal Doe #4 identity, then Doe #4 should identify Doe # 1, 2, and 3 for Plaintiff, and that Doe #4 should also be a defendant because he failed to intervene with respect to his conversation with Doe #1. (<u>id.</u>) In a letter dated 3/2/2023, the AAG provided a Doe #4 information to Plaintiff, as CERT Officer 66-71, who is also <u>Correction Officer Steve Farrell</u>, and stated that Farrell may be served at Fishkill. The AAG then alleged that, "While DOCCS' agency counsel has advised that there does not appear to be a use of force connected to Farrell and that any CERT Officer deployed may have been posted in the recreation room, records indicate that Farrell searched Sampson's "cube" on the day of the incident. (*See* Doc. 46, at foot note 1). This Court should take note that the same way the AAG obtained Farrell's identity from cube searched slip, the AAG could have done the samething to obtain the other 24 unknown defendants that searched the other 24 cubes and the other 2 rooms and then give their information to Plaintiff to include in this first amended complaint. Furthermore, Farrell is not the Doe #4 that used force against Sampson.

11.     After CERT Thompson participated in opening the windows, he walked over to the metal detector and directed LeClair to bring Plaintiff over to the metal detector. At this point LeClair let go of Plaintiff's fingers and had Plaintiff put his hands at his side. CERT Thompson then instructed Plaintiff to walk around the metal detector and Plaintiff complied with the direct order.

12.     Immediately after Plaintiff cleared the metal detector, LeClair had Plaintiff again inter-lock his fingers over his head, and once again grabbed Plaintiff's inter-locked fingers and began squeezing them as if they were made of plastic, causing the Plaintiff substantial pain. Plaintiff asked LeClair to stop squeezing his fingers because of the pain; in response LeClair squeezed even harder and told Plaintiff to "shut [his] mouth." Defendants 1 thru 5 observed and heard the exchange but failed to intervene. (*See,* Exhibit 2 [Housing unit log book dated 12/29/2021]).

13.     Defendants 1 thru 5 further observed when LeClair escorted Plaintiff from the metal detector into one of the side rooms of the recreation room and had Plaintiff remain standing right in front of the wide open windows where the very cold air was coming in full blast on Plaintiff's semi-nude body. (*See,* Exhibit 2, ante.) Plaintiff told LeClair that "It is freezing back here." And asked him to close the windows, and if he could have his cloths to put back on because "I just got over a fever and I don't want to get sick again", but Plaintiff was told by LeClair to "Shut [his] fucken mouth!", and to keep his fingers inter-locked over his head. LeClair then told other John Does to watch the Plaintiff because he was going to search his room and then he left. (*See,* Exhibit 3 [contraband receipt dated 12/29/2021]).

14.     Two John Doe CERT Officers were standing outside the door watching Plaintiff. A Jane Doe Officer was also standing outside across the door looking in on the Plaintiff. One of the John Doe then told the Plaintiff to "Move up closer to the wall and keep [his] eyes locked on the wall." Soon thereafter other I/Is were placed in the same room to remain standing across from Plaintiff.

15.    There were approximately 25, 4 'ft. by 8 'ft. windows all around the recreation room. All of them were fully opened by the CERT Officers.

16.    Upon information and belief, LeClair knew that his fellow CERT Officers had already planned to open all the windows. LeClair condoned the opening of the windows when he refused to close the windows after the Plaintiff asked for the windows to be closed because of the cold. It was their means of punishing us (myself and other I/Is), 99% naked in the cold, for the actions of another I/I's attempt to escape from the facility.

17.    Other housing units were also subject to the same inhumane conditions, forced 99%-naked to freeze in front of fully open windows. (*See,* Exhibit 4 [Affidavit # 1 I/I Rodriguez]).

18.    The side recreation room that LeClair put Plaintiff to stand in was filthy. Upon information and belief the recreation room had been closed down, on or around 2016, due to mold and other unfit conditions.

19.    Within 30 minutes of standing in front of the wide open windows, Plaintiff's body started to shiver uncontrollably as a result of the cold air coursing his 99%-naked body. When one of the John Doe CERT Officers saw Plaintiff shaking he told the Plaintiff to, "[s]tand still and don't move." At which point Plaintiff explained to John Doe #1[7] that he felt as though his legs were about to give out because of the uncontrollable shivering. Plaintiff then asked if the windows could be closed; explaining that he had just gotten over being sick, protesting that he did not want to get sick again. When Plaintiff pointed this out to the CERT Officers; #1 came closed-up to the Plaintiff and yelled "!! SHUT THE FUCK UP!!"; I/I Eladio Pena also heard this. (*See,* Exhibit 5 [Affidavit #2 I/I Pena]).

---

[7] John Doe CERT # 1 who works at Fishkill; is white, around 5' 11' 185lb; approx. 27 yr old, clean shave with blue eyes, and blond hair. The AAG claimed that Doe #1 cannot be located. (*see,* Doc. 36, at f.n. 2)

20.     Within an hour of Plaintiff standing almost entirely naked in front of the open windows blowing ice cold air (30% with wind chill); making the room seem like an ice box; while holding his inter-locked fingers over his head; was in extreme pain, arms feeling like jelly, and feeling like he was going to pass out, that he quickly rested his forehead on the wall to stop himself from falling and then quickly stood up straight. During the search several I/I passed out in other housing units around the prison from this inhumane treatment.

21.     After about an hour and a half of standing in the cold, John Doe #1 told Plaintiff, I/I Pena, and the other I/Is that were standing across from the Plaintiff too switch positions by having us unlock our fingers from over our heads and inter-lock them behind our backs.

22.     This new position caused Plaintiff's shoulders and upper body a great deal of pain because of the shivering and the way he was ordered to hold his inter-locked hands behind his back; Plaintiff was in this new position for approximately 40 min.

23.     When the CERT Officers finished searching the entire housing unit, Plaintiff suffered another 35 min. of shivering almost naked in the cold before they finally return him to his room.

24.     All in all, the Plaintiff was exposed standing almost naked in the freezing cold for approximately 2 and half hours (2 ½).

**Plaintiff Returns Back to His Room After Search:**

25.     Once back in his room, he put his clothes back on and the Plaintiff drank several cups of tea to help warm his body from standing in the freezing cold for that number of hours. It was about 4 hours before the Plaintiff felt the chill stop coursing through his body.

**Plaintiff Starts to Feel Sick After Being Exposed to the Cold:**

26.     Later that night, Plaintiff, started to cough. On the following night, December 30, 2021, pain took over the Plaintiff's upper body. As the days proceeded from the 30th to January 9, 2022, Plaintiff's coughing and pain got worse throughout that whole period. Even when trying to

sleep he was in immense and immobilizing pain, making it nearly impossible to care for himself.

27.     On January 10, 2022, at approximately 7:50pm, Plaintiff forcing himself through the pain got out of bed and went to the kitchen to make soup; while attempting to make the soup he was having extreme difficulty breathing and almost fainted. Plaintiff notified the housing unit Officer of his condition, upon which time the Officer determined that the Plaintiff needed to be seen by the Medical Department. Despite Plaintiff's deteriorated condition, he was given a pass around 10 min. after 8:00pm and told to walk almost a ¼ of a mile to the Clinic.

**Plaintiff Forced to, Walk, to Emergency Sick-Call:**

28.     In route to the clinic while walking in the hallway, Plaintiff's breathing got worse, to the point that he started gasping for air. By the time he exited the building his breathing became so bad that he had to walk slower in the snow to try and catch his breath; Corrections Officer K. Quash noticed something was wrong with the Plaintiff and asked, "Mullings, are you alright?" but Plaintiff did not answer him because he was unable to speak.

29.     When Plaintiff finally arrived at the clinic at 8:30pm, almost 20 min. after he left his housing unit; he was immediately attended to by Nurse S. Mukkat ("RN Mukkat"). During her evaluation RN Mukkat asked the Plaintiff to relay to her how he was feeling; whereupon he expressed through very few words that he could barely catch a breath and that every breath he did take caused extreme pain. RN Mukkat, also asked when the symptoms began. Plaintiff, the best he could, explained that prior to the Facility search he had felt ill on or about December 22, 2021, and recovered around December 27, 2021. Plaintiff then explained that during the Facility search of his housing unit on December 29, 2021 he was made to strip down to only his underwear by the CERT Officers and ordered to stand in a room that was in ice box like conditions and that after this he started to feel ill again which progressively got worse since that day. (*See*, Exhibit 6

[Ambulatory Health Record Progress Note dated 1/10/22]). However, RN Mukkat failed to include in Exhibit 6, that the Plaintiff told her that he got sick again by the CERT Officers.

30.    At one point during the evaluation RN Mukkat could barely hear everything the Plaintiff was saying to her. So the area officer, a male caucasian, yelled at Plaintiff by saying, "Speak up to let her hear what you're saying!!" Plaintiff then explained to the officer that he is trying but when he started speaking he is running out of air which is cutting off his speech. This officer may heard when Plaintiff told RN Mukkat that the CERT Officer get him sick again.

**RN Mukkat Notifies Dr. Zamilus of Plaintiff's Condition:**

31.    After evaluating Plaintiff RN Mukkat notified the Fishkill Medical Director Gaetan Zamilus ("Dr. Zamilus"), by phone, advising him of Plaintiff's condition. Dr. Zamilus thereupon ordered that the Plaintiff be given a rapid Covid test, and for her to administer 2 liters of oxygen via nasal canula. After about an hour, RN Mukkat again contacted Dr. Zamilus, and informed him that the Covid test came back negative and that the oxygen was not helping; RN Mukkat was then instructed to contact and have Plaintiff seen by Tele-Med.

**Plaintiff's Tele-Med Consultation with Dr. Ellis:**

32.    During the Tele-Med consultation Plaintiff spoke with a Dr. Ellis explaining to her that he had just recovered from a fever and he was forced by CERT Officers to stand in *only* his underwear in a room that was so cold that you could compare it to standing in a walk-in refrigerator, for more or less 2 ½ hours, and that since that time he got sick again to the point where he was in severe pain and having difficulty breathing which led him to emergency sick-call that night. Dr. Ellis then ordered RN Mukkat to administer an Albuterol Nebulizer treatment, and Tylenol. She also instructed her to call an ambulance.

**Ambulance Arrives at Fishkill, Takes Plaintiff to St. Luke's Hospital:**

33.      Around 10:50pm the ambulance arrived and transferred the Plaintiff to Saint Luke's Cornwall Hospital in Newburgh (SLCH). Upon his arrival at SLCH Plaintiff was evaluated in the ER by a Dr. Scot B. Hill, who diagnosed Plaintiff with pneumonia, and mild hypoxia at 1:13am and with a deliberate indifference to the Plaintiff's well-being; sent him back to Fishkill instead of admitting so he could receive the proper treatment, inasmuch as, Fishkill's medical clinic is not properly equipped. (*See*, Exhibit 7 [SLCH medical records dated 1/11/22]).

34.      A Covid test was also taken at SLCH which was negative. (Exhibit 7, *ante*).

35.      Upon information and belief, Dr. Zamilus arranged for SLCH to sent Plaintiff back to Fishkill instead of admitting him because of monetary incentives.

**Plaintiff Returns to Fishkill From SLCH:**

36.      At 5:00am, on January 11, 2022, Plaintiff arrived back at Fishkill's Medical Clinic. Nurse M. Pierre' (RN Pierre') immediately informed Dr. Zamilus of SLCH's findings and that the Plaintiff was given antibiotics and a Z-pac while at SLCH. Dr. Zamilus then instructed her to admit the Plaintiff into the Facility's infirmary and continue the treatment. During this time the Plaintiff informed Pierre' that he was having chest pain when coughing. (*See*. Exhibit 8 [Ambulatory Health Record Progress Note dated 1/11/22]).

**RN K. Jones Observes Plaintiff in Pain:**

37.      At 5:40am, while in the infirmary RN K. Jones observed Plaintiff breathing shallowly and grunting while trying to catch his breath; while in the clinic RN Jones also observed seeing the Plaintiff in agony. When she checked his oxygen levels she found it to be 88% while attempting to talk, and 91% while at rest. Plaintiff then complained to Jones that the pain was worse when coughing. (*See*, Exhibit 9 [infirmary progress notes 1/11/22]).

### RN M. Pierre' Acts with Deliberate Indifference:

38.     Later that day RN Pierre', and Officer J. Lee entered Plaintiff's room in the infirmary and she said to him "[g]et up from the bed and let me take your vitals." Plaintiff then outstretched his arm and asked if she could take his vitals while he was laying down because he was in immobilized pain and when he moves or sits-up the pain gets worse and started coursing through his body which takes hours before it subsides; she responded being deliberately indifferent to his condition "I said sit up now!" When the Plaintiff attempted to sit-up he instantly fell back from the pain. Officer Lee then asked Plaintiff if he had Covid, and after Plaintiff said no, Lee put his arms around the Plaintiff and helped him to sit-up while Plaintiff groaned in pain, after which Pierre' took his vitals and falsely stated in Plaintiff's chart that "he denies pain." While making her logbook entry Lee was helping the Plaintiff lay back down because of the excruciating pain.

39.     Sometime during the early morning hours, Plaintiff could not sleep because of the difficulty he was having trying to breath, and because of the pain which was exacerbated by the continuous coughing. Because of the heightened pain and difficulty breathing, he attempted to push the emergency intercom button to get help, he found that it did not work; as a result Plaintiff had to painfully fight his way up out of the bed to get the attention of a nurse or an officer; no one was around so he was left gasping for air.

### Dr. Zamilus' Acts with Deliberate Indifference almost Cause Plaintiff's Life

40.     On January 12, 2022, at around 7:00am, RN C. Bron ("Bron") while doing rounds came into Plaintiff's room and saw him sitting at a table wheezing with a pillow and sheet sitting on the table so he could rest his head. Upon seeing the Plaintiff in this way she asked him if he was feeling any better. Plaintiff explained to her in very few words that he was feeling worse, and when he speaks the pain is so bad it feels like he is going to die.

41.    After telling her this, Bron took Plaintiff's vitals, then she immediately said to him, "I'm going to get the doctor to send you out." When she returned with Dr. Zamilus, he observed the Plaintiff grunting in severe pain and shallow breathing at the table and asked Plaintiff what he was felling, in response Plaintiff said, "I am dying. Please send me to another hospital because I feel worse. I am in lot of pain; I can't breathe and when I talk I am in even more pain, and then I start to gasp for air and I feel like I'm gonna die." Plaintiff also said to Dr. Zimalus that he cannot move from the table because of the pain that's holding him down. After telling him these things, instead of Dr. Zamilus exercise professional medical judgment and immediately hospitalize the Plaintiff to let him get essential medical treatment that is not available at Fishkill medical unit, for his life-threatening situation, Dr. Zamilus ignored the Plaintiff's requested to hospitalize him, and then instructed Bron to apply a non-rebreather, and to up the oxygen from 3 liters to 5 liters. At this point Plaintiff overheard Bron started to argue with Dr. Zamilus to send Plaintiff to an outside hospital; amongst other things, she was saying to him, "I'm telling you send him to a hospital because something is wrong with him, and the numbers are not right." However, Dr. Zamilus also ignored Bron's requested to hospitalize the Plaintiff and ordered her to take the easier but less efficacious treatment that only delay the Plaintiff's urgent medical care.

42.    At around 9:10am Nurse Bron checked on the Plaintiff to see if Dr. Zamilus method of treatment was working. When she asked the Plaintiff how he feeling now, Plaintiff told her "Worse." Bron then got angry and said, "[y]ou know what, I'm gonna send you out to Mount Vernon for 8 days"; Plaintiff responded by telling her thanks.

43.    Upon information and belief, Dr. Zamilus denied Plaintiff's and Bron's request to immediately hospitalize the Plaintiff for adequate medical treatment for the Plaintiff's life-threatening condition is because of monitary incentives.

**Mobile Life Arrives at Fishkill to take Plaintiff to a Second Hospital:**

44.     At around 9:40am, the Mobile Life personnel arrived in Plaintiff's room in the infirmary, put him on a stretcher,[8] while on the stretcher in the hallway the male Mobile Life Technician told the Plaintiff to hang in there. While in the hall Nurse Bron was asked by the make Mobile Life Technician "[w]here are we taking him?"; Bron answered "Mount Vernon." At that point the Mobile Life Technician responded to her "[h]e's not going to make it to Mount Vernon. We have to take him somewhere closer." Based upon the Mobile Life Technician's determination the Plaintiff was instead transferred at 9:50am to Putnam Hospital Center (PHC) in Carmel, NY.[9]

**Plaintiff Admitted to PHC for 8 Days:**

45.     On January 12, 2022, at about 10:15am, Plaintiff arrived in the Emergency Room at PHC and was diagnosed with bilateral pneumonia, bilateral pulmonary embolism (PE), respiratory failure, and chest discomfort. After one of the doctors informed Plaintiff of the diagnosis, he also told the Plaintiff that he would be admitted into the hospital for 2 weeks because you could have died. Plaintiff was thereafter given a cocktail of medications, Lovenox, Rocephin, and a vaccine for pneumonia, to name a few. (See, Exhibit 10 [PHC Diagnosis records]).

46.     On January 18, 2022, the PHC ruled out Covid as the cause of Plaintiff's symptoms. (See, Exhibit 11 [PHC records/Covid results]).

47.     Despite the fact that PHC had ruled out Covid as the causation of Plaintiff's symptoms, on the same date January 18th, Dr. Janice Wolffriedman falsely wrote in Plaintiff's medical records at Fishkill that the Plaintiff was positive for Covid, and Covid pneumonia. (See, Exhibit 12 [Admission & Discharge Summary]).

---

[8] On August 13, 2022, Officer Santiago told Plaintiff that she saw him on the stretcher on Jan. 12th, and that she had expressed to another co-worker that he looked really sick.
[9] In May 2022, Plaintiff went on a medical trip with Officer M. Morton who told the Plaintiff that he was in the back of the ambulance on Jan. 12th, and that he overheard the EMT tell the driver to go to PHC because he would not make it to Mount Vernon Hospital.

48.    While at the hospital the Plaintiff was in so mush pain and weak that he could not sit up or even get out of bed to use the bathroom; as a result Plaintiff was given a sponge bath by a elderly Spanish woman and her daughter; and a catheter was put in so he could urinate. The Plaintiff was also coughing up blood.

## Plaintiff Returns to Fishkill from PHC and spoke with RN Pierre and RN Bron:

49.    On 1/19/2022, Plaintiff was discharged from PHC. Upon his arrival back at Fishkill Plaintiff was once again admitted into Fishkill's medical infirmary; once there he was continued on the treatment proscribed at PHC being, Eliquis, Augmentin, Iboproph, and other medications. While in his room in the infirmary, Plaintiff was attended to by RN Pierre' who was there to take his vitals; this time the Plaintiff was able to sit-up on his own and said to her, "see I was telling you that I was still in pain when I came back from St. Luke's", in response Pierre' stated "St. Luke's should have kept you out there when we sent you out the first time."

50.    On January 21, 2022, RN Bron entered the Plaintiff's room and took his vitals. After taking Plaintiff's vitals Bron asked the Plaintiff how he was feeling; Plaintiff responded, "I feel better." Thereupon thanking her for defying Dr. Zamilus and saving his life.

## A Fishkill Incarcerated Individual got adequate care for his Pneumonia but not Plaintiff:

51.    While in the infirmary, an I/I informed the Plaintiff that he too was diagnosed at SLCH for pneumonia and was transfered to another hospital for adequate care for two weeks. Upon information and belief, Dr. Zamilus arranged the I/I transferred. Plaintiff did not get this care.

## Plaintiff Sent Back to PHC:

52.    On January 23, 2022, Bron noticed that Plaintiff's left ankle was swollen; concerned about additional blood clots, called for an ambulance and sent him back to PHC where a ultra-sound was conducted; and was negative for clots. Plaintiff was brought back to Fishkill, re-admitted into the infirmary where he remained until January 28th, 2022 and release back to

general population.[10]

**Institutional Grievance:**

53.    Plaintiff set forth in a grievance dated February 3, 2022, that he had just recovered from a

fever and the CERT Officers exposed him to the freezing weather and got him sick again. He

also asserted that he was badly treated in Fishkill infirmary by "various nurses"[11], and an

"African doctor"[12] who after being told by RN Bron that Plaintiff needed to "send me to a out

side hospital but he refused to do so" [sic] "so she  called an ambulance for me and i was

transported to Putnam Hospital" [sic].

54.    On March 3, 2022, the Grievance Committee, (ignoring the abusive conduct of the CERT

during the Facility search), concluded that, "Per. DHS 'A'[13,] the medical provider at this facility

has given the grievant at this facility *all the necessary care afforded to an incarcerated*

*individual while under the custody of the NY DOCCS." (Emphasis added).*

55.    The C.O.R.C.'s[14] decision concluded that, after an investigation done by the Division of

Health Services, C.O.R.C. concluded that Plaintiff was *currently* receiving appropriate medical

care. C.O.R.C. further concluded that the CERT issue was untimely. (*See,* Exhibit 13 [C.O.R.C.

Decision])[15].

---

[10] On or about February 16, 2022, at a clinic call-out Plaintiff was seen by Nurse Weinrit who while
reviewing Plaintiff's records stated, "Respiratory failure. Damn you could have died." Also, on or about
July 28, 2022 while at a scheduled cardiologist appointment, Cardiologist J. Tartaglia, also expressed to
the Plaintiff that he could have died.
[11] Later discovered that one of the various nurses was RN M. Pierre'
[12] Later discovered that the African doctor was Dr. G. Zamilus.
[13] Deputy Superintendent of Health Services, A. Akinyombo
[14] Central Office Review Committee
[15] Plaintiff was hospitalized before he was able to submit the grievance.

### Fishkill Officer J. Willson Intented to obstructed Plaintiff's Access to the Court, etc.:

56.     On September 15, 2022, Plaintiff went to housing unit 4-2 to get ready to go to immigration custody. While at 4-2, at approximately 2:00pm, Plaintiff was packing up his legal papers to take with him. During this time, a draft officer and an I/I[16], who was working with Officer J. Willson ("Willson") appeared in front of the Plaintiff's cell, and Willson informed the Plaintiff that he is going to immigration but he cannot take his legal papers. The Plaintiff then plead to Willson to let him take his legal papers with him because he needed them to submit a motion in the court "wherever" he goes. Despite the Plaintiff's explanation to him, Willson said to the Plaintiff, "You are not allow to bring your legal papers at immigration."

57.     On September 16, 2022, Plaintiff was transferred from Fishkill to Wende Correction Facility ("Wende") without his legal papers but they were safely left behind. Plaintiff's legal papers are consisted of: (1) Albany NY Police Department 911 Sprint Reports/Radio Transmission, (2) Crime Scene Log and police notes, (3) Officer Darrel Gipson's Police Incident Report, (4) Detectives Peter J. McKenna's and Anthony Ryan's follow up police reports, (5) witnesses statements, (6) Albany PD followup police reports, (7) all Albany police photo identification procedure, (8) finger prints report, (9) Albany Police Department entire file, (10) Albany District Attorney's entire file, (11) witnesses interview statement, (12) Albany DA's photo spreed with witnesses, (13) Plaintiff's arrest report dated 1/23/2001, (14) Albany Police Court arraignment minutes dated 2/23/2001, (15) Grand Jury minutes dated 2/28/2001, (16) Albany County Court arrangement minutes dated 3/9/2001, (17) Omnibus motion dated 4/11/2001 and the DA's Mark J. Caruso Opposition to Omnibus, (18) pretrial hearing dated 5/31/2001, (19) motion to dismissed defective indictment submitted by Jason L. Russo dated

---

[16] On or around 12/6/2022, Plaintiff saw the I/I at immigration. He told Plaintiff that his name is Ramon. He also told Plaintiff that the draft officer's name is J. Willson. Upon information and belief, Willson allowed I/I Ramon to bring his legal papers at immigration.

6/20/2001 and Caruso's Opposition to it and many other motion before trial, (20) a proceeding in August 2001, (21) a *Wade/Mapp/Dunnaway* hearing minutes dated 9/4/2001, (22) trial minutes dated 11/26/2001 through 11/30/2001, (23) witnesses' criminal history sheets, (24) sentencing minutes dated 5/2/2002, (25) re-sentencing minutes dated 4/19/2011, (26) CPL 440.10 motions filed in 2004 and 2020 and the DA's oppositions, (27) Appellate Counsel's and supplimental briefs and 440.10 appealed motions, (28) NY Court of Appeals appealed applications, (29) federal petitions pursuant to § 2254 and the Second Circuit Court of Appeals petitions, (30) Untied States Supreme Court Petition, and (31) Newly Discovered Evidence that came to light in 2017 showing that Detective J. McKenna's and Anthony Ryan's used prior false testimony and coersion to wrongfully convicted Carl H. Dulkes and Lavell R. Jones in 1998, and many more important documents

**Plaintiff in Buffalo Federal Detention Facility:**

58.    On September 20, 2022, Plaintiff was transferred from Wende to Buffalo Federal Detention Facility ("BFDF"), Batavia, New York 14020 by Detention Officers. Upon his arrival at BFDF, Plaintiff noticed that other I/Is arrived at BFDF with their legal papers on the same day. Plaintiff then asked the Processing Detention Officers at BFDF if he is allow to bring his legal papers with him "here" from the prison and the officers said "Yes."

**Fishkill Superintendent Burnett Retaliated Against Plaintiff Legal Papers Because of this Complaint Plaintiff Filed Against Him and Others:**

59.    On or around October 2022, Plaintiff legal papers was placed inside of Fishkill law library by an I/I. On or around the first week in November 2022, Plaintiff telephone the assembly man Edward Gibbs' ("Gibbs") Office at 212-828-3953 and asked one of his employee, Keith Lilly ("Lilly") to contact the Fishkill Supt. Burnett by phone and explained to him what Willson did on 9/15/2022 and ask him please to mailed Plaintiff's legal papers to him at Batavia. Plaintiff

then provided Lilly with Plaintiff's address at BFDF to give to Supt. Burnett to mailed the legal papers to him. During the conversation with Lilly, he informed the Plaintiff that he was going to get Supt. Burnett's cellular phone number from his boss, Gibbs, and call the Supt. Burnett.

60.     On or around the second week in November 2022, one of Plaintiff friend, Kevin Whyte, Din#: 00A6209, at Fishkill, email Plaintiff's other friend, Jerome Edwards on the street and told him to tell Plaintiff that Fishkill's authority(s) pack up his legal papers and allegedly shipped them to Plaintiff.

61.     On December 22, 2022, Plaintiff contacted Lilly by phone and told him that he believe the authority in Fishkill shipped off his legal papers to him. Plaintiff then asked Lilly if he had spoken to anyone regarding his legal papers and Lilly said, "I called Commissioner Cal in Albany...." Lilly and Plaintiff then assumed that Commissioner Cal may have called Supt. Burnett, who then had Plaintiff's legal papers taken out of Fishkill law library. Plaintiff had asked Lilly to find out from Commissioner Cal who he had spoken with in Fishkill to had Plaintiff's legal papers pack up. However, Plaintiff never get back a respond from Lilly. Anyway, as of date, Plaintiff as yet to receive his legal papers, which is around 4,000 pages. Plaintiff then emailed the BFDF mailroom and asked a Detention Officer if any legal papers were shipped from Fishkill to BFDF for him. In response, a BFDF Officer Ty responded to Plaintiff's questioned and said no.

62.     On or around July 2023, Whyte was at BFDF with the Plaintiff and stated to the Plaintiff that his correct message to Edwards was to tell the Plaintiff that a Fishkill's law clerk told Whyte that Fishkill authories removed Plaintiff' legal papers from the law library, which is Sergeant Carbone area to do that.

63.     Upon information and belief, it appears that Supt. Burnett was notified about Plaintiff's legal papers either by Lilly or Cal; and then ordered Sgt. Carbone and the other Defendants or

subordinate acting on behalf of Supt. Burnett to retaliated against Plaintiff's legal papers by not shipping them to the Plaintiff and destroyed them.

64.    Plaintiff also asked the Fishkill law library Officer Jumano in a notarized letter dated 3/1/2023 please to shipped his legal papers to him. A copy of this letter was sent to the AAG (See, Exhibit 14 [Notary Letter sent to Fishkill Law Library Officer and to the AAG]).

## V. CAUSE(S) OF ACTION:

### First Cause of Action:

65.    CERT Officers acts and/or omissions on December 29, 2021, while searching housing unit 10-2; which caused pain and suffering to the Plaintiff constituted Cruel and Unusual Punishment in violation of the 8th Amendment of the United States Constitution; whereas, on the above date the Defendant(s), along with Chad LeClair and the other CERT, did force the Plaintiff to stand for approx. 2 ½ hours with his arms up and hands on his head causing Plaintiff unbearable pain and dizziness due to the military torture, that the Plaintiff had to quickly rested his forehead on the wall to prevent himself from fainting and then quickly stood up straight because they had ordered him not to move. Defendant Chad LeClair did also on the same date while Plaintiff's fingers were inter-locked above his head, did use excessive force by squeezing Plaintiff's inter-locked fingers together for approx. 6 minutes causing excruciating pain. Defendant Chad LeClair also intentionally meant to put Plaintiff in the very cold winter weather when Plaintiff told him that it is cold back here, asked for the windows to be close, and for his clothes to put on because he just recovered from a fever and don't want to get sick again, but LeClair ignored Plaintiff's explanation and requests with evil intent to the Plaintiff's well-being.

### Second Cause of Action:

66.    S. Thompson and the other CERT Officers acts and/or omissions, on December 29, 2021, while searching housing unit 10-2, in forcing the Plaintiff to stand in *only* his underwear in hear

freezing temperatures (30% with wind chill) for approx. 2 ½ hours; constituted a deliberate indifference to the Plaintiff's well-being and safety constituting Cruel and Unusual Punishment in violation of the 8th Amendment of the United States Constitution; whereas, on the above date the Defendant(s) including Chad LeClair did, with deliberate indifference, force Plaintiff to disrobe down to his underwear while S. Thompson and the others opened all the windows, forced the Plaintiff to stand in near freezing temperatures for approx. 2 ½ hours, denied Plaintiff's requested to closed the windows, and did deny him his clothing to shield the severe cold from his body, causing the Plaintiff to become ill again, which eventually developed into bilateral pneumonia, thereby causing him to suffer respiratory failure, and bilateral pulmonary embolism (PE) that almost caused his death and ongoing pain and suffering whereas; Plaintiff must now take medication for the rest of his life, and must suffer shorter breath because of scared lungs; and is now receiving breathing treatment (Nebulizer) twice a day, all as a direct result of the Defendant's actions.

**Third Cause of Action:**

67.     As to Defendants numbered 1 thru 5, acting in their individual capacities as *respondeat superior* did through their acts and/or omissions, and with a deliberate indifference to Plaintiff's well-being; did negligently allow CERT Officers, while working in their individual capacities as subordinates of Defendants 1-5; to open all the windows and force the Plaintiff to disrobe down to *only* his underwear, thereafter forcing him to stand in said condition, in near freezing temperatures for approx. 2 ½ hours, and did deny him his clothing. As *respondeat superior*, Defendants 1-5's failure to assert control over the CERT Officers who opened the windows, and forced the Plaintiff to stand in near freezing temperatures in *only* his underwear for approx. 2 ½ hours while in their presence constitutes Cruel and Unusual Punishment in violation of the 8th

Amendment of the United States Constitution, as though they committed the acts themselves. Said failure to act did cause the Plaintiff to catch pneumonia thereby causing him to suffer respiratory failure, and bilateral pulmonary embolism (PE) that almost caused his death and ongoing pain and suffering whereas; Plaintiff must now take medication for the rest of his life, and must suffer shorter breath because of scared lungs; which required Plaintiff to now taking breathing treatment (Nebulizer) twice per day; all as a direct result of the Defendants disregard for the Plaintiff's well-bing.

**Fourth Cause of Action:**

68.    Dr. Gaetan Zamilus acts and/or omissions on January 12, 2022, were deliberate indifference to the Plaintiff's serious medical needs; whereas, on the above date Dr. Zamilus denied the Plaintiff's and RN C. Bron's requests to immediately hospitalize the Plaintiff to let him get "essential medical treatment" that is not available at Fishkill medical unit; and then forced Bron to take a easier and less efficacious treatment; by having her up the liters from 3 liters to 5 liters and also had her applied a non-breather to Plaintiff's life-threatening conditions; that this choice of treatment that Dr. Zamilus ordered Bron to apply to the Plaintiff's serious medical needs was *not* sound medical judgment; the fact that, had Bron continues with Dr. Zamilus' course of inadequate treatment and not called for an ambulance to immediatley take Plaintiff to an outside hospital for proper care; and had Mobile Life not made a reasonable medical decision by disregard taking the Plaintiff to Mount Vernon Hospital, and taken Plaintiff to a nearby hospital (PHC), Plaintiff would have die (see foot note 8 through 10 above); the fact that he was diagnosed for respiratory failure, PE, and for chest discomfort on top of his prior diagnosis of pneumonia at SLCH when he arrived at PHC. Therefore, Dr. Zamilus' denial to immediately hospitalize the Plaintiff for essential medical treatment for the Plaitiff's life-threatening situation

over Zamilus' inadequate treatment violated Plaintiff's 8th Amendment Constitutional rights.

69.     Dr. Zamilus acts and/or omissions on January 12, 2022 also constitues cruel and unusual punishment in violation of the Plaintiff's Eighth Amendment Constitutional rights; whereas, on the above date Dr. Zamilus ignored Plaintiff's and RN Bron's profession medical judgement to immediately hospitalize the Plaintiff for "essential medical treatment", thereby delay the Plaintiff's urgent medical needs for 2 ½ hours. As a result, the 2 ½ hours delay exacerbated the Plaintiff's life-threatening and fast degenerative condition; caused prolonged excruciating immobilized pain, worsen his breathing, worsen his severe coughing, and contributes to his PE and respiratory failure that he was diagnosed for when he arrived at PHC; Put another way, the 2 ½ hours delayed to hospitalize Plaintiff earlier could have prevent Plaintiff's respiratory failure. Therefore, Dr. Zamilus's delayed to immediatley hospitalize the Plaintiff for reasonable prompt treatment amount to deliberate indifference, and is not medical malpractice because he was aware of the Plaintiff's serious medical needs. See paragraphs 40-41 above. See also *Chance*, 143 F.3d at 703 (quoting *Hathaway* III, 99 F.3d at 553).

70.     Upon information and belief, Dr. Zamilus' acts and/or omissions on January 12, 2022, as noted at paragraph 35 above, was deliberate indifference to the Plaintiff's serious medical needs, when it appears that the 2 ½ hours delay to immediately hospitalize the Plaintiff was a direct result of monetary incentives, which proves that Dr. Zamilus had a culpable state of mind in his choice of medical care.

71.     Upon furhter information and belief, Dr. Zamilus acts and/or omissions on January 12, 2022 in providing adequate medical treatment to an I/I who told the Plaintiff in Fishkill infirmary that he too was diagnosed at SLCH for pnuemonia and then Dr. Zamilus arranged for the I/I transferred to another hospital to get adequate care for two weeks, was deliberate indefference to

the Plaintiff well-being and in violation of the Plaintiff's 14th Amendment Constitutional rights to the "equal protection of the laws" when Zamilus failed to arrange for Plaintiff to get the same treatment. See paragrap 53 above.

**Fifth Cause of Action:**

72.    RN M. Pierre's acts and/or omissions, on January 12, 2022, after Plaintiff outstretched his arm and asked for her to take his vitals while he was laying down in the infirmary bed; explaining to her that the excruciating pain in his body is preventing him from moving or sitting up and that whenever he moves the pain gets worse, and it takes hours before it settles back to a less painful level; she was deliberate indifference to Plaintiff's well-being by causing him more pain when she gave him a direct order, yelling at him, to sit up in the bed to let her take is vitals. That when Plaintiff's attempted to sit up he fell right back in the bed on his back because of additional pain; that Officer J. Lee had to put his arms around Plaintiff and help him to sit up through elevated pain; constitutes Cruel and Unusual Punishment because every other nurses or doctors that the Plaintiff informed of his condition were sympathetic to the Plaintiff and took his vitals while he was laying down in his bed in the infirmary and the outside hospitals; therefore, as a direct result of RN Pierre' deliberate indefference to the Plaintiff's serious medical condition that she was aware of, her action aggravates or worsen his sickness and put him back in another hospital.

**Sixth Cause of Action:**

73.    Officer J. Willson acts and/or omissions, on September 15, 2022, when he intentionally lied to the Plaintiff that Plaintiff is not allow to bring his legal papers with him into immigration custody after Plaintiff informed him that he needed his legal papers to fight his wrongful conviction wherever he goes; that when Plaintiff arrived at BFDF, other Prisoners arrived with their legal papers; and the BFDF Officers informed the Plaintiff that he is allow to bring is legal

papers with him. As a direct and proximate cause of Willson's actions, Plaintiff was deprived of his rights to the United States 1st and 14th Amendment Constitution of the following: (1) "property", (2) intentional obstruction of access to the court because he needed his legal papers to submit a freestanding claim of actual innocent motion and do not have them; and (3) "the equal protection of the laws" when; upon information and belief, Willson allow Roman, who is from a different country, to bring his legal papers with him at immigration (see foot note 16 above) but did not afford the Plaintiff the same rights.

**Seventh Cause of Action:**

74.      Defendants 1 through 3 and 7, and Sgt. Carbone acts and/or omissions, violated Plaintiff's first Amendment rights to be free of retaliation. That is, Keith Lilly contacted Commissioner Cal by phone and brought to his attention that Fishkill Officer J. Willson falsely informed Plaintiff that he is not allow to bring his legal papers to immigration custody; whereby Plaintiff legal papers were left back inside of Fishkill law library. Then after Lilly spoke with Commissioner Cal, soon thereafter Plaintiff's legal papers were packed up from Fishkill law library and allegedly shipped to Plaintiff in November 2022, which Plaintiff as yet to receive. Upon information and belief, it is reasonable to say that Commissioner Cal and or Lilly had contacted Supt. Burnett with respect to Plaintiff's legal papers, and soon thereafter, Plaintiff's legal papers were pack up from Fishkill law library by Sgt. Carbone and other defendants, who were acting on behalf of Defendants 1 through 3 and 7, or maybe the defendants had instructed someone else to do so and then possible destroy Plaintiff's legal papers; all because of this complaint that Plaintiff filed against the defendants that is before this Court. Once again, Plaintiff's first Amendment rights to be free from retaliation has been violated. However, the Supt. Burnett and Sgt. Carbone intentionally failed to shipped the legal papers off to the Plaintiff is a constitutional violation.

## VI.   INJURIES

As set forth in § VI, ¶¶ 1-74 *infra.,* the Plaintiff as a direct result of the Defendants acts and/or omissions caused the Plaintiff to catch pneumonia thereby causing him to suffer respiratory failure, and bilateral pulmonary embolism (PE), that created a grave risk of death and ongoing pain and suffering whereas; Plaintiff must now take medication for the rest of his life, and must suffer shorter breath because of scared lungs, and is now receiving breathing treatment (Nebulizer) twice a day.

## VII.   RELIEF

As a *PRO SE* litigant with no formal legal training, Plaintiff asks this honorable Court to liberally construe his complaint; however inartfull it may be plead, to make the strongest argument(s) that they suggest, and not hold it to the stringent standards then formal pleadings drafted by an attorney.

**WHEREFORE**, Plaintiff, Andrew R. Mullings, *PRO SE*, prays for and requests that an ORDER be issued Declaring that the Defendants have acted in violation of the United States Constitution, and for a judgment in his favor and damages in his favor against all Defendants in an amount sufficient to compensate him for the pain and mental anguish by them due to the maliciously, sadistically, deliberate indifference and intentional misconduct of the Defendant(s) Edward Burnett, Michael Daye, C. Churns, Joseph Noeth, Darren Miller, S. Thompson, M. Pierre', Gaetan Zamilus, Chad LeClair, J. Willson, Steve Farrel, and the John Doe CERT Officer (s) 1 thru 38 individually that prevent Plaintiff from viewing their face, and/or as they performed in concert with their cohort(s).

**FURTHER**, Plaintiff, Andrew R. Mullings, *PRO SE* prays for and request $25,000,000.00 as compensatory damages and/or coverage of all passed and future medical bills (including but not limited to medication, etc.) to awarded to Plaintiff from the individual named

Defendant(s); this including the J. Willson's acts and the Defendant(s) retaliation acts together with any and all attorney fees and costs, and for such additional relief as this Court may deem just, proper, and equitable.

FURTHERMORE, Plaintiff, Andrew R. Mullings, *PRO SE*, prays for and requests $150, 000.00 as punitive damages be awarded to Plaintiff from each named individual Defendant (s).

Pursuant To 28 U.S.C. § 1746, I, Andrew R. Mullings, Plaintiff, *PRO SE*, Declare Under The Penalty Of Perjury That The Foregoing Is True And Correct To The Best Of My First Hand Knowledge And Belief.

DATED:  December 28, 2023
        Batavia, New York

                                        Respectfully Submitted,

                                        Andrew Mullings, Plaintiff, *PRO SE*



## VIII.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the 5 Causes of Action are supported by existing law or by a non-frivolous argument to change existing law; (3) the factual contentions have evidentiary; support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperism* (IFP) status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997 e (a), and that Plaintiff's case may be dismissed if he has not exhausted administrative remedies as required.

Plaintiff agree to provide the Clerk's Office with any changes to his address. Plaintiff understand that his failure to keep a current address on file with the Clerk's Office may result in the dismissal of his case. Attached to this complaint are exhibits 1 through 14.

1/4/2024
Dated

Plaintiff's Signature

Andrew                                                Richard

[2]

| Andrew | Richard | Mullings |
|---|---|---|
| First Name | Middle Name | Last Name |

| Buffalo        Federal | Detention        Facility, | 4250 Federal Drive |
|---|---|---|
| Detention Address | | |

| Batavia, | New York | 14020 |
|---|---|---|
| County, City | New York | Zip code |

Date on which I am delivering this complaint to authorities for mailing: 1/4/2023

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:22-cv-07922-CS

Mullings v. Burnett et al
Assigned to: Judge Cathy Seibel
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 09/15/2022
Jury Demand: Plaintiff
Nature of Suit: 555 Prisoner: Prison
Condition
Jurisdiction: Federal Question

**Plaintiff**

Andrew R. Mullings

represented by **Andrew R. Mullings**
A# 075 809 426
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020
PRO SE

V.

**Defendant**

**Edward Burnett**
*Superintendent, Fishkill Correctional
Facility, in their individual capacity*

represented by **Elizabeth Barbanes**  *Assistant Attorney General*
NYS Office of The Attorney General
Westchester Regional Office
44 South Broadway
White Plains, NY 10601
914-422-8765
Fax: 914-422-8706
Email: elizabeth.barbanes@ag.ny.gov
*LEAD ATTORNEY*

**George Patrick Burns , Jr.**
New York State Office of the Attorney
General
Westchester Regional Office
44 South Broadway
5th Floor
White Plains, NY 10601
914-422-8755
Email: George.Burns@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avninder Aujla**
Office of the Attorney General
44 South Broadway



RECEIVED
JAN 08 2024
U.S.D.C.
W.P.

🛑 Notice: (/notice-to-the-bar) Fulltime MJ Vacancy Notice & Application (/sites/default/files/2022-09/Fulltime%20MJ%20Vacancy%20Notice%20%26%20Application.pdf) ✕

Home (/) » Courthouses (/courthouses) » White Plains Courthouse

*The Hon. Charles L. Brieant Jr.*

# Federal Building and Courthouse White Plains, New York

**Location:**
White Plains, New York

**Address:**
300 Quarropas Street
White Plains, NY 10601-4150

**Telephone:** (914) 390-4100

**Courthouse Hours:** 8:30 am - 5:00 pm

**Clerk's Office Hours:** 8:30 am - 5:00 pm

*Honorable Cathy Seibel*

| *United States*<br>**District Judges** | *United States*<br>**Magistrate Judges** | *Facilities*<br>**Manager** |
|---|---|---|
| Judge Philip M. Halpern ▸ | Magistrate Judge Kim P. Berg ▸ | Thomas Mixon |
| Judge Kenneth M. Karas ▸ | Magistrate Judge Andrew E. Krause ▸ | |
| Judge Cathy J. Seibel ▸ | Magistrate Judge Paul E. Davison ▸ | |
| Judge Nelson S. Roman ▸ | | |
| *See All (/judges/district-judges)* | *See All (/judges/magistrate-judges)* | |

In 1978, the U.S. Congress designated White Plains, New York, where patriots fought for liberty on October 28, 1776 and the Declaration of Independence was first read in New York on July 10, 1776, as a "place of holding court." On October 17, 1983, the United States Courthouse opened in White Plains, New York. This first courthouse was a leased facility, but in 1991, Congress authorized the construction of a new courthouse.

The new courthouse, located at 300 Quarropas Street, opened on May 15, 1995. On November 13, 1995, during the administration of President William J. Clinton, the U.S. Courthouse in White Plains, New York was so dedicated. Read more... (pdf) » (/sites/default/files/pdf/site_wpfacts.pdf)

Both U.S. District Judges and U.S. Magistrate Judges preside over cases filed at the White Plains Courthouse. Each judge participates in Electronic Case Filing (ECF).

Also, located within the White Plains Courthouse are the Bankruptcy Court, Pretrial Services, Federal Defenders, U.S. Probation, U.S Marshal Service and an Office of the U.S. Attorney.

The White Plains Clerk's Office is located on the first floor, directly behind the security check-in area

## Directions

*Petition of the*
**Commonwealth of Puerto Rico pursuant to Title III of PROMESA**

*Learn More (/promesa)*

*Rulings of*
**Special Interest**

**September 21st, 2022**
In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001 (/sites/default/files/2022-09/03md570_5neual%20interest.pdf)

**September 13th, 2022**
IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION (/sites/default/files/2022-09/In%20re%20Google%20Digital%20Advertising%20Antitrust%20Litigation.pdf)

**September 8th, 2022**
Securities and Exchange Commission v. AT&T Inc. et